Good morning, you're Mr. Hales? Good morning, your honor. I am, indeed, and it's my honor and privilege to come before you today on behalf of my daughter, who is seeking justice in the form of being able to tell her story to the jury. Very good. Before we go further, we have this motion for permission to file a reply brief out of time. The motion is granted and the record will show that later, so we'll The story that that Lauren would like to have told to a jury is a compelling one. It's a true story and more importantly, for purposes of a summary judgment motion, it's she's entitled to have it be deemed to be true and then have the facts taken in the light most favorable to her. In starting the process, however, she was slammed, I guess you'd say, by the district court right from the get-go when they decided, or the court decided, that she could not proceed on her action under the Iowa Civil Rights Act because of a timeliness issue, and that is notwithstanding the fact that we were waiting for the EEOC to issue its right to sue letter, I basically was begging the EEOC's regional director to issue the right to sue letter within the time frame that would allow us to... The timeline, EEOC gave the letter of suit to sue, for you to sue, right? After the... All right, well, after you got that letter, how much time elapsed before... they're saying that you can't toll it because you don't have any extraordinary circumstances. Well, I don't know off the top of my head exactly how many days it was, but I know that the fact is that the prescribed period under the Iowa statute was gone, and it's not that we waited around. Well, the length of time, I believe, is probably not in your favor. That's why they're saying that, but the only thing that you could do, if you had the evidence to do it, is under extraordinary circumstances, you could pull that. Sorry, but I don't find any. Okay, we think... Do you have some? I believe so, Judge, and that's the fact that, despite my pleadings with the EEOC to issue that letter, within the time frame, they simply did not do it. And that put my client, my daughter, in a position to decide, if she wants to have her federal claim heard in a federal court, which we ended up doing, then she was going to have to do that at a time before, or excuse me, at a time after the time had expired for a state court action. And so, again, in order to keep both of the claims viable, we had to have filed in a state court, and that was not what we wanted to do. It's a federal question. We wanted to have a federal bench decide that. We just couldn't do it because the EEOC didn't issue the right to sue letter. I don't know if that answers your query or not. Close. All right, Judge. There are several things going on here, obviously. The three different rulings from the court, we believe, were all in error. Aside from the fact that she wasn't allowed to proceed under the Iowa Civil Rights Act from the get-go, which prejudiced the case from the beginning, there are came a point to where the fact of her three prior sexual assaults and expert testimony regarding that was deemed to be inadmissible by way of a motion in limine. The judge basically saying that it had no relevance to whether or not she had a subjective view that sexual harassment was occurring when she was attacked outside of the store that night, which I believe was a little bit of an overstatement. It's a ludicrous opinion, but the judge issued it, and so we had to go forward without that benefit. The summary judgment part of it was not taking into account every single fact as alleged or as indisputed taken in the light most favorable to her, and I think that was clear from the contents of the ruling, where it was recited in the beginning that this was the standard. However, time and time again, there were factual determinations that were made that were contrary to the light most favorable, and in fact contrary to what was either in dispute or not. In that regard, I think it's important in the first sense for the summary judgment aspect of it that she had put out the district court had put out the order saying that again on a timeliness matter on the EEOC's issuance of the right to sue letter that we were untimely because it was stated on the notice that it was sent at a certain time, and there is a rebuttable presumption that when there is an affidavit of mailing that that creates a quote rebuttable presumption absent contrary evidence that the actual notice was actually sent and received at a certain time. Well, we presented evidence that it was not in the form of my own testimony for one, and also the circumstances at the EEOC where they had issued two separate notices under two separate case numbers that we already knew from prior history that they were dilatory in issuing those notices in the first place, and yet in the context of a summary judgment motion where all facts are to be taken in the light most favorable to the non-moving party, the district court decided that that just wasn't enough to overcome the presumption, basically faulting me personally for having some depression after a wife left and me not checking mail except for every two to three days sometimes. Well, that didn't mean that I didn't check my mail, and of course at the same time I'm yelling at the EEOC's regional director to please send me the right to sue letter. It just makes no sense that that letter was sitting in my mailbox the whole time. I can tell you I was checking the mailbox. I avert that fact to the district court, certainly enough to rebut the presumption that what the EEOC's document said that it was sent and received by me. I think maybe the most interesting part of the whole appeal, maybe your honors will agree with me or not, but it has to do with whether or not the Oncala decision is controlling in this as it relates to the particular aspects that a plaintiff will find themselves in and whether that's limited to the suing. We would submit that it goes far beyond that, that when you want to consider a plaintiff's particular position and all the relevant facts and circumstances, that you need to take into account whether or not this person, frankly, was sexually assaulted three times, and when a fourth man came upon her, whether or not her actions were reasonable. Whether or not she subjectively perceived that what was happening to her was, in fact, sexual harassment. So I don't know whether the court had any questions about that particular aspect, but I kind of smelled that maybe that was something that was of concern to you. I also want to make sure that the court, I want to point out for the court the fact that there's a couple of cases emanating from this court of the 8th District that I think are very important to deciding the merits of the appeal. And, in fact, one of them is Ogden v. Waxworks, Inc., where the 8th Circuit acknowledged that resisting sexual advances, particularly when they are physical in nature, is, quote, the most basic form of protected activity. And that's exactly what happened in this case. And, again, the name of that case is? Yes. Oh, it's in your brief, right? Yes, Ogden v. Waxworks. Okay. And, secondly, Excel v. Bosley, also in the brief, where the court, this court, said, quote, This gives rise to the question of prior conduct by the attacker, if you will, that was known to cases in the form of two complaints that were made by other female employees about this man that were not investigated, did nothing about it. And, in fact, a lower-level employee took it upon himself to, quote, unquote, step up to the plate and talk to this guy about what he was doing, where the store manager did nothing. Then, when he attacks Warren, approximately six months later, the store manager didn't know it was the same person because she never even talked to him the first time. So she reviewed a videotape spent over an hour for her deposition testimony, reviewing the surveillance tape. She characterized the lunge at Warren as looked like he was throwing something in a trash can or throwing something away. But she had no idea that this was the same person, nor did the store manager that fired Warren without conducting any investigation, without reviewing any tape. And so, when you put those together, it does not, and I don't want to confuse the issue because Cases did a, with all due respect, a good job of trying to throw a red herring in here about whether or not the prior instances of conduct by this man constituted sexual harassment. And that's really not the point here. The point is that Cases had a duty to prevent what was going to happen to Warren and then to take appropriate remedial action afterward. We submit that it wasn't appropriate measures or reasonable measures to prevent it from happening. And because of that, the holding that I just read for you in Excel, E. Bosley applies. You can't not prevent, to use a double negative, you can't not prevent something from happening in the workplace and then fire the employee for defending herself. And I think that's exactly what happened here. The other red herring that, again, due respect to Cases, that they were able to bring to light and convince the court to look other than that at the true issues was that they alleged that Warren was less than a model employee, which we dispute. And which, if relevant, would have been a material fact that would preclude summary judgment. But they wanted to bring up the fact, or the allegations, that she was less than a model employee. But the holding under the U.S. Supreme Court in the University of Texas v. Nassar says otherwise. It's basically raised the level from the substantial factor to the but-for test. And if, in fact, Cases did terminate Warren and would not have done so but for her conduct, then that's the standard that should be used. And the store manager has sworn under oath that this was a situation where it was the straw that broke the camel's back. Which, by definition, means if you don't have that straw, the camel's back doesn't break. And that she was not going to be terminated but for this incident. So trying to cloud the issue, trying to paint Warren as the bad apple here, although inappropriate, was successful at the district court level. There's also much ado about whether or not Warren actually reported this incident. And the facts are, per her... I should interrupt. Were you going to save some time for rebuttal? Yes. Well, you're running into your rebuttal time. The yellow light came on, as I said earlier this morning, so if you want to reserve it... I'll reserve it right now, then. Very well. Thank you kindly. I'm here from counsel for the... I can't believe... Mr. Tice? Yes. Good morning, sir. Thank you, Your Honor. And you might want to raise the lectern a little bit so we're sure to pick up your voice. There's a button there somewhere underneath, maybe in the middle, somewhere. Let me see. Maybe there. Oh. Okay. Is that good? That's enough. All right. I think that's high enough. May it please the Court, Andrew Tice of the Ellers and Cooney Law Firm here on behalf of Casey's Marketing Company, which employs the employees at Casey's General Stores, convenience stores we're probably all familiar with. This claim stems out of an employment issue and a single isolated incident down in Burlington, Iowa years ago between Casey's employee, Lauren Hales, and a customer, culminating in the customer being burned by Ms. Hales' lit cigarette. So just to be clear, this isn't the standard employment claim where there is an employee of the employer that is doing something allegedly improper, but it's a customer. Some of the facts that I want to point out, as I heard the— I wrote down why is Casey so solicitous of this fellow. He certainly doesn't have much to commend himself, does he? No, and I'm not sure what you mean by solicitous of him. He is a customer of theirs that would come in on a regular basis. I'm surprised they hadn't thrown him out before. But there was—and that's a good point to reference the prior complaint. There was one single prior complaint involving this fellow that involved two female employees. The female employees reported that he would follow them around during their shift to make it difficult for them to do work. There was some reference that he might have gotten flirtatious and mentioned some type of sexual matter with these two employees on this one report that was received. Once it was—and now I should actually back up. There was never any kind of a report that this customer ever touched any employee, ever threatened to touch an employee, ever threatened an employee, or, quite importantly, that the employees ever themselves felt threatened. They were annoyed. That was the report that was given to Casey's. The response that Casey's had was that their night clerk— Life is tough. They're working in a convenience store, and so there's going to be all types of people that would come in. I don't know that it's so tough. It's more of these employees were annoyed and wanted to let them just do their job. And so the response that Casey's gave was to have the employee that was on shift, when this customer would come in at that store, because he would come in late at night. I think it had something to do with a paper route or something like that. And so that employee that was typically on duty approached him. I think it was actually the very same day the complaint was received. He told him that these two female employees did not appreciate him talking to them and that he would need to stop, and that the next time it happened, the police would be called and he would be banned from the store. The response he got from the customer was that the customer was, quote, very apologetic, very sorry, said he didn't realize that the employees were so offended and that it wouldn't happen again. And thereafter, the customer continued to visit the store, but was not talking to the employees anymore. So for all intents and purposes, it did seem that this admonition had been honored and was successful. And so what finally happened? Well, I was trying to figure out the timeline here. I heard reference that it was six months later there was this incident with the plaintiff. In fact, the evidence shows that it was somewhere between seven months and a year later there's this incident, which is May 20, 28, 29. So in your view, there was a substantial relapse of time between the reported incidents and this incident? Well, I think there was, and to indicate that there was really the one prior report. I'm not even sure that prior incidents would be accurate when it's really just a customer having conversations that the other people felt were annoying. So there's seven months to a year between that one report that had been dealt with and this incident on the nugget question. What was the time? I don't know if I understood your colleague over here, but his argument is that there's no extraordinary things for tolling the statute. He claims that the EEOC prevented his complying with the statute. Is that correct? It is not correct. There are two separate statute of limitations issues before the court. The one I think you're referring to is the Iowa Civil Rights Act claim. Right. In that case, no, there certainly wasn't anything that the EEOC did that made the plaintiff here miss her deadline. And there's no doubt there is a statutory deadline under Iowa law for bringing this Iowa claim, the Iowa Civil Rights Act, and that plaintiff missed it by a mile. The deadline is 90 days after issuance of the right to sue, which in this case was undisputedly issued June 4, 2014. Plaintiff filed their complaint 217 days later, more than twice as long as she would have otherwise been allowed, on January 7, 2015. There's really no excuse for that. That's what the district court found. And there were actually a couple of options available to the claimant other than just plain letting the statute of limitations expire and later seeking equitable tolling. Plaintiff's options included, one, bringing all their claims, state and federal, in an Iowa district court. I think counsel acknowledges that was an option they just, for some undisclosed reason, decided they didn't want to do it. The other option they had was to file timely their state court action under the Iowa Civil Rights Act, which would make sense. And then later, once they got the EEOC right to sue, they could bring a federal action in the United States District Court. They chose not to, and the district court obviously did not feel that there was adequate reason for equitable tolling. And I would also acknowledge, for equitable tolling, typically what's required is that there's some ambiguity or misleading information which would compel the application. Well, the word extraordinary is what they use. Yeah. And in this case, there wasn't anything like that. Actually, both notices from both the state and the EEOC that were issued, all were pretty clear, as they're issued many times to many people, you need to be filing these things timely. It says right on there, this many days from the date of the notice, and plaintiff in this case just chose not to. So if I could go back then, some of the facts I would want to point out as we're talking about the interaction on the night in question is, undisputed, Ms. Hales never, at any point during their approximate half-hour conversation, ever asked the customer to leave. She never contacted the police, even though, coincidentally, a couple of police officers came into the store while they were in there discussing. Nothing was said to them, and she didn't contact the police afterwards. That's contrary. This is a month-and-a-half long employee who acknowledged in her deposition, she had previously called the police while on duty at Casey's when she saw a customer that she thought was drunk. So she certainly knows how to do it, she just didn't feel the need. She also never completed an incident report that would have been set forth within the handbook she received just a month-and-a-half earlier. She never called either of her supervisors, the one for the store she was at or her home store supervisor. In fact, she never even reported this incident to her own counsel of record and father, who she was living with at the time, until days later after she'd already been confronted. Under all these facts, I think there's significant reason to question the descriptions of this incident as an attack. All of what you've just said may give credence to Counselor Hale's argument that the district court should have admitted the evidence of what this young woman had been subjected to earlier in her life. I think we're able to explain why she hadn't done the things that Casey now thinks she should have done immediately. Yeah. To go to, that's the issue that was addressed in the motion in Lemony and to exclude the expert. The court obviously excluded that evidence not just on one ground, but on two. The first of which was being that it was irrelevant to the issues presented. And that's where I think your question probably goes. We believe that actually the relevant evidence is what happened that night, what the plaintiff can testify to, but not so much what might have happened in unknown and entirely distinct circumstances. I'll put it this way. I'm sort of lost in the thought. What reasons were given, again, for Casey's termination of this young woman? We never fully got that part resolved as this case was resolved on a motion of summary judgment. There were the issues of performance concerns, and then there was this incident as well. The incident in which it could be argued to a jury that she was engaged in self-defense. Well, I think there's more to that. That would go towards the retaliation count. Well, whatever. Okay. Which the court opted to reject for several reasons, one of which being that the response here wasn't a reasonable response under the circumstances, under either an objective or subjective standard. Well, why shouldn't a jury be able to make that determination? I remember our late departed colleague Richard Arnold in some negligent type of cases saying, why wouldn't the jury in effect be making a moral decision in the larger sense of the word, saying that this young woman, granted, probably could have done something else, perhaps could have, but why wasn't it justified or at least understandable and explainable in the circumstances? Well, I can say one, as it speaks to the retaliation count, the first problem with that was that it was time barred. And that's the EEOC failure to file that we had, and it was rejected on that basis. Separately, it was rejected on the merits as well. And the merits looked into the fact that there was no actual unlawful employment practice of Casey's. See, the issue here, because it's a customer and it's not an employee, is that it has to be an unlawful employment practice of Casey's. So under the law, Casey's had to know or have reason to know of the alleged harassment. Of course they didn't. Casey's wasn't aware of this interaction at all. It was never reported on the scales. And then that goes back to the other issue of one singular report, seven months to a year earlier, of other customers being annoyed by this fellow. But nothing about any threatening conduct. Let's put those aside. Why couldn't this be a standalone reason enough to explain what this young woman did that night? Why couldn't what be? I mean her actions with respect to pipe. The prior sexual assault and how that would play into this incident? No, no, no. The burning with the cigarette. Why should not a jury be entitled to look at that as justification for what this woman did? Is your answer is that that would be irrelevant to any of the issues in the case? Well, I think it's certainly irrelevant to the summary judgment issues that were addressed. And then one of them being... How was summary judgment, Judge Ebinger, made a decision of her own saying that, what, it's irrelevant or not sufficiently injurious to this woman or something like that? Well, that was certainly part of it. I mean the district courts addressed it in multiple layers. It wasn't just one reason why the claims were rejected. One of them being that none of this could be attributed to the employer in this case. There wasn't the prior knowledge. Another one being that, objectively, under these facts, there were numerous other options available to Ms. Hales that she chose not to take. And that's where the district court cites then-Judge Sonia Sotomayor's case, the Cruz v. Coach Storrs case, where a person slapped their alleged harasser. And the court stated that, even assuming arguendo, that the plaintiff did so in response to Title VII barred harassment, it was not a protected activity to physically assault somebody. Let's see. In which case was that? Cruz v. Coach Storrs, 202 F. 3rd, 560. Oh, that's when she was on the circuit court. Second circuit, yes. Which we can give credence to or not. We can say, Judge Sotomayor, you're out in the left field on that one. That's correct. It's certainly up to this court to decide how to- We'll give it the credence it deserves. Understood. What's in the record in the district court on this issue of the EEOC right to sue letter and the timeliness of the claim? Counsel said that-I think he said he submitted an affidavit of his own. I don't know that it was an affidavit. I think it might have just been a verbal pronouncement in hearing. I don't recall precisely. The record is clear that the EEOC issued its notice on September 24, 2014, and that the law would have this presumptive receipt three days later. The record is also clear that plaintiff testified she didn't pay attention to her mail, even though the mailing address used by the EEOC was correct. Was that in a deposition? It was. It might have been in hers, but there was also a deposition taken of counsel in this case, and counsel acknowledged that the plaintiff wasn't paying attention to things like this. She wouldn't know what to do with it. And then the record is also clear, as counsel acknowledges here today, that he testified under oath that he wasn't paying close attention to his mail in the operative time frame either. The important thing here is that the notice was sent- I saw some reference to some testimony that the notice was received, but much later. Yes, I believe counsel is contending that it was received on June 3, 2015. Is there testimony in the record to that effect? I believe it's actually included within the complaint. It actually came about maybe in the first or second amended complaints. And so was Ms. Hale's father deposed? Yes. And did he talk about that in the deposition? I don't recall where or how he says it was received on June 3, nine months later. I don't recall that. I just know that that is the contention that they're making. As best we can tell, it's simply their own self-serving testimony that it must have arrived nine months later for some unknown reason with the EEOC, even though the EEOC documents show it was issued on September 24, 2014. And I would point out there is this three-day presumptive rule that one court has acknowledged is to eliminate the plaintiff's ability to manipulate the date of receipt. It has been held that the plaintiff's personal representation of receipt on another date is not enough itself to overcome that presumption. The point I also wanted to make, and I almost forgot about it, was there are two separate notices that went out from the EEOC, one to the plaintiff, one to counsel. We don't really have an explanation as to why the plaintiff herself didn't get her notice. I see that my time is up. But they went to the same address. They did go to the same address. You're right. I shouldn't have had to ask you who wrote the Cruz case because it's right in the breadth of Judge Hebinger's decision. Well, anyway, thank you for your argument. Thank you, Your Honor. Mr. Hales, I think you have roughly a minute. A short amount of time. A short minute. Thank you, Your Honor. Well, first and foremost, I did testify at deposition as to the timing of the EEOC receipt of letters. I didn't know that that was going to be inquired about this morning. I do not have it handy, but it is in the appendix in the record. With regard to the assertion that Mr. Piper's conduct was simply annoying to the other two complainants prior to what happened to Lauren, I'll read from the affidavit very briefly from Brianna Rose, who was one of the complainants. It finally got to the point where the man started telling me what he liked sexually. I decided I'd had enough and reported this to the store manager, Sherry Tomatos. The store manager responded by telling me that if I didn't like it, I could tell the man to leave the store or I could call the police. That's how they dealt with that sort of a complaint. Also, there is an assertion that... You may continue for that minute. Thank you, Your Honor. There is an assertion that there was an admonition given to Mr. Piper by Casey's, and that didn't happen. It was an individual employee who took it upon himself, and that's borne out by the deposition testimony of the store manager, Ms. Tomatos, who had this exchange. I grabbed the wrong paper. I can tell you that my question to her, and I'll happen to paraphrase for the moment, was, did you direct this lower-level employee to talk to Mr. Piper? The answer is no. Did he take it upon himself to do so? Yes. And again, I'm sorry that that's a paraphrase, but my time is up. Very well. Thank you, Your Honors. Thank both sides for the argument. This is submitted, and we will take it under consideration.